Argued and submitted October 16, 1987, affirmed March 9, reconsideration denied May 6, petition for review denied May 24, 1988 (305 Or 672)

# AETNA CASUALTY AND SURETY COMPANY,
*Appellant,*

*v.*

# BRATHWAITE et al,
*Respondents.*

## (16-85-09013; CA A41212)

751 P2d 237

Daniel M. Holland, Eugene, argued the cause for appellant. With him on the briefs were Jaqua, Wheatley, Gallagher & Holland, P.C., Eugene, and Denise G. Fjordbeck, Eugene.

William Wiswall, Springfield, argued the cause for respondent Sharon Brathwaite. With him on the brief were Wiswall and Hendricks, P.C., Springfield, and George Kelly, Springfield.

No appearance for respondent Thomas Feher.

VAN HOOMISSEN, J.

## VAN HOOMISSEN, J.

This is an action for a declaratory judgment in which Aetna Casualty and Surety Company (Aetna) seeks a declaration of its rights and responsibilities under two homeowner's insurance policies issued to defendants Feher. Aetna appeals[1] from a trial court judgment which held that Aetna had a duty to defend and indemnify the Michael Feher estate (Feher) in a wrongful death action brought by the Christopher Brathwaite estate (Brathwaite), because Feher's shooting of Brathwaite was *not* within the intentional act exclusions of the insurance policies.[2] The dispositive issue is whether the trial court erred in holding that Aetna had not met its burden of proving that Feher intended to shoot Brathwaite. We review to determine whether there is any evidence to support the trial court's findings of fact, *Lindsey v. Dairyland Insurance Co.,* 278 Or 681, 688 n 5, 565 P2d 744 (1977), and whether its conclusions are supported by its findings. 278 Or at 688. We conclude that the trial court's conclusion that Feher did not act intentionally is supported by the evidence. Therefore, we affirm.

Before November 12, 1984, Aetna issued to Thomas and Joanne Feher two homeowner's insurance policies providing primary and excess liability coverage. The policies were issued in Washington and were in full force and effect on November 12. Michael Feher, the Fehers' 19-year old son, was an additional insured under the policy. The primary homeowner's policy excludes coverage for

"bodily injury * * * which is expected or intended by the insured."

The personal excess indemnity policy excludes coverage for

"personal injury or property damage arising out of any act committed by or at the direction of the insured with intent to cause personal injury or property damage * * *."

On November 8, 1984, Michael Feher purchased a "SWAT" military uniform. He told the salesclerk that he needed it for a "terrorist party." He had told his girlfriend that

---

[1] A cross-appeal was withdrawn.

[2] Before trial, Aetna's counsel advised the court that, for purposes of trial, even though one policy excludes coverage for "expected or intended" harm and the other excludes coverage only for intended harm, both policies should be read and interpreted to exclude coverage only if the harm was intended by Michael Feher.

he had fantasized about breaking into a Bi-Mart store and stealing some ammunition and then getting involved in some kind of a shooting episode. On November 12, at approximately 4:15 a.m., he broke into Anderson's Sporting Goods and stole a Colt AR-15 rifle and a Ruger mini-14 rifle.

At approximately 8:30 a.m., Feher confronted Wheatley in a tunnel leading to the weight room at Autzen Stadium on the University of Oregon campus. He was armed with the two guns, was wearing a military uniform and had camouflage paint on his face. He had approximately 500 rounds of ammunition with him. He demanded to be taken to a telephone. He pointed the rifle at Wheatley and said, "See the red dot on the middle of your back? You're dead if I pull the trigger any further." He followed Wheatley into the weight room and stopped when he saw that there were other people present. He then said: "See this red dot? If I pull the trigger you will be dead." He ordered the people to move to the back of the room and left.

Shortly afterward, O'Shea left the weight room. He walked to the stadium field and saw Feher in the bleachers above him. Feher yelled at O'Shea to go back inside and fired the AR-15 rifle. O'Shea was struck by several bullet fragments. He went back to the weight room, where the others barricaded the doors and called the police.

Officer Hoyer arrived at the scene about 8:39 a.m. He heard shots, followed by a break and then more shots. About 9:00 a.m., he heard a single shot. Officer Green had arrived at the stadium at about the same time as Hoyer. He drove his car over a foot bridge, parked it and approached the stadium on foot from the south. He saw Brathwaite, who was jogging on a trail south of Autzen about 300 yards from Feher's position. He heard shots and yelled for Brathwaite to get down. Then he heard more shots.

Brathwaite's body was discovered nearby. He had been killed by an AR-15 rifle bullet which had entered his thigh and traveled upward through his body to his heart. The trial court received evidence that the shot was a ricochet which was not intended to strike Brathwaite. The court found that it could not be determined whether the bullet entered his body straight on or whether it was deflected off some other

object. There were no eye witnesses to the shooting of Brathwaite. Officers also found five marks on the jogging trail, which some of the officers concluded might have been bullet strike marks. A forensic scientist testified that the marks appeared no different from other marks caused by joggers and pedestrians on the trail. A bullet was found in one of the marks.

Feher's body was discovered inside the stadium at the top row of the bleachers. He had died of a self-inflicted gun shot wound to the head. Officers found a number of shell casings in the bleacher area and in a concession booth which had a view of the jogging trail. The distance from the concession booth to where Brathwaite's body was found is 814 to 840 feet. Feher also had fired a number of shots randomly in various directions both inside and outside the stadium, damaging windows and other property. There was testimony from five psychiatrists. They all agreed that Feher suffered from serious mental illness; they disagreed only as to the extent of his illness and the proper label for his condition.

Sharon Brathwaite, Christopher Brathwaite's personal representative, filed an action against the Feher estate, alleging that Michael "Feher * * * fired approximately 6-20 shots at Christopher Brathwaite, one of which struck and killed him." The parent Fehers asked Aetna to defend the estate. Aetna concluded that it did not have a duty to defend or indemnify the estate, because Michael's actions came within the "intentional act" exclusions of the policies. Aetna then filed this declaratory judgment action.[3] Because Feher and Brathwaite are dead, there is no direct evidence of Feher's subjective intent. It must be determined from the circumstances.

The trial court made detailed findings of fact. It found, *inter alia:*

"6. On November 12, 1984, Michael Feher caused the death of Christopher Brathwaite by firing shots from a position in Autzen Stadium, in Lane County, Oregon, employing an AR-15 rifle using .223 caliber ammunition.

"7. Michael Feher thereafter committed suicide in Autzen

---

[3] The parties waived a jury trial.

Stadium on November 12, 1984. Thomas L. Feher is his duly appointed personal representative.

"* * * * *

"18. During the trial substantial evidence was produced by both parties regarding the mental state of Michael Feher at the time Christopher Brathwaite was shot and killed.

"19. The Court received this evidence for whatever relevance it might prove to have under the law as ruled by the Court. The issue of mental state was extensively briefed by both parties prior to trial and their memoranda in regard thereto were filed with the Court.

"* * * * *

"24. The evidence does not reveal any viciousness on the part of Michael Feher, prior to November 12, 1984, toward people generally, or any group or class of people, or any individual.

"25. The evidence with respect to the shooting at or toward Rich O'Shea is at least as consistent with an intent by Michael Feher to frighten O'Shea, as it is with an intent by Michael Feher to injure or kill O'Shea.

"* * * * *

"41. On November 12, 1984, Michael Feher intended to fire or discharge an AR-15 in a public place.

"42. In going to Autzen Stadium on November 12, 1984, Michael Feher intended to fire or discharge an AR-15.

"43. Michael Feher fired and discharged an AR-15 at Autzen Stadium on November 12, 1984, at least 67 times, with up to 16 shots going into an area to the south of the stadium which included a public road, a portion of the stadium parking lot, public jogging trails, a water canal, and wooded areas.

"44. Of the rounds fired to the south of the stadium, several went into the vicinity of Christopher Brathwaite, between 814 and 840 feet away from Michael Feher, hitting Christopher Brathwaite. The fatal bullet struck Christopher Brathwaite on the left thigh, traveling upward (toward Christopher Brathwaite's abdomen) leaving shallow wounds in the thigh, entering Christopher Brathwaite's abdomen and piercing his heart.

"45. There were five marks in the sawdust jogging trail in the vicinity [of Brathwaite's body], more or less evenly spaced. In one such mark a bullet from the AR-15 rifle in question was found. The other four marks could have been made by bullets, but no bullets were found within or beyond them. Assuming

that all five such marks were made by bullets from the AR-15, their location and the location of the body of the deceased are consistent with a theory that Michael Feher was following the running victim in his gunsights, firing, and hitting the victim with his sixth shot.

"* * * * *

"55. Michael Feher committed suicide by shooting himself with the AR-15 at 9:08 A. M.

"56. Michael Feher intended to shoot at or near Rick O'Shea.

"57. Michael Feher intended to shoot himself when he did so.

"58. In between the time he shot Rick O'Shea and himself, Michael Feher intended to shoot into the area [of the jogging trail where the body of Brathwaite was found].

"59. Michael Feher intended to and did shoot into the stadium club, where the venetian blinds were closed, the press box area, and the stadium scoreboard. A bullet was found in the Boy Scout building located to the north of Autzen Stadium, at quite a distance and in a line behind the scoreboard from where he was shooting from the sponsors' section.

"60. Michael Feher did not shoot at any of the ten athletes in the weight room area * * *.

"61. Michael Feher did not shoot at anyone until he positioned himself near or within the roofed sponsors' section of Autzen stadium.

"62. [Aetna] has not sustained its burden of proving that Michael Feher intended or expected to hit Christopher Brathwaite with a fired round.

"63. Michael Feher knew, at the time he shot into the area where Christopher Brathwaite was, that the firing of the rifle could cause harm if he struck Christopher Brathwaite with his shot.

"64. Michael Feher understood that the natural consequences of hitting a human being with an AR-15 was harm.

"65. Michael Feher understood the consequences of shooting himself with an AR-15, that is, the natural consequence of firing an AR-15 at himself was harm.

"66. If Michael Feher intended or expected to hit Christopher Brathwaite, he was able to distinguish between right and wrong, and knew that the act was wrong.

"67. If Michael Feher intended or expected to hit Christopher Brathwaite, as a result of mental disease or defect he lacked

the substantial capacity to conform his conduct to the requirements of the law.

"68. If Michael Feher intended or expected to hit Christopher Brathwaite, he did not lack substantial capacity to appreciate the criminality of his conduct.

"69. If Michael Feher intended or expected to hit Christopher Brathwaite, he was suffering from a derangement of his intellect which deprived him of the capacity to govern his conduct in accordance with reason, and while in that condition acting on an irrational impulse he shot and killed the decedent."

The court stated that

"there is a lack of evidence in this case of viciousness toward another on the part of Michael Feher. I find that there is a lack of evidence of motive on the part of Michael Feher to injure Christopher Brathwaite, and that it is difficult even to reach by speculation any real or imagined way in which he might have thought it would serve any purpose of his own to injure Christopher Brathwaite. And all of these factors lead me to conclude that [Aetna] has not met its burden of showing that the shooting of the deceased Brathwaite, by Michael Feher, was intentional on his part."

The court concluded that the facts did not bring the case within the "intentional act" exclusions of the insurance policies and that Aetna is under a duty to defend and indemnify the Feher estate.[4]

 The insurance policies were issued in Washington to Washington residents. Thus, on matters of substantive law,

---

[4] Following nine days of trial, receipt of 288 exhibits, testimony of 51 witnesses and a view of Autzen Stadium and the surrounding area, the trial court announced its decision by letter opinion:

"I find generally that the fatal injury by gunshot of Christopher Brathwaite, for which damages are sought by his personal representative from the Estate of Michael Feher in Lane County Circuit Court case number 16-85-00082, was not 'bodily injury . . . which was expected or intended by the insured,' or 'personal injury . . . arising out of any act committed by or at the direction of the insured with intent to cause personal injury . . .,' within the meaning of the exclusions contained in plaintiff's homeowner's insurance policy and personal excess indemnity policy, issued to Thomas L. and Joanne Feher, and in effect on November 13.

"*Accordingly, my decision is that the exclusions do not apply and the plaintiff has a duty to perform its insurance contracts in connection with the litigation described.*

"Please proceed as provided in ORCP 62 to request special findings and to object to the requested findings."

Washington law controls. *Davis v. State Farm Mut. Ins.,* 264 Or 547, 549, 507 P2d 9 (1973). Oregon law applies to procedural matters. *Seattle-First National Bank v. Schriber,* 51 Or App 441, 446, 625 P2d 1370 (1981). The policies exclude coverage for intentional injury. Washington and Oregon law both focus on the actor's subjective intent. *See Nielsen v. St. Paul Companies,* 283 Or 277, 281, 583 P2d 545 (1978); *Rodriquez v. Williams,* 107 Wash 2d 381, 729 P2d 627 (1986). A declaratory judgment action to determine coverage under an insurance policy is an action at law. *Hartford v. Aetna/Mt. Hood Radio,* 270 Or 226, 229, 527 P2d 406 (1974). Because this is an action at law, the findings of fact by the trial court must be affirmed if supported by any competent substantial evidence. *Boyce v. Standard Investment Co.,* 263 Or 82, 84, 501 P2d 65 (1972).

Aetna contends that the trial court erred in finding that Feher did not intend to shoot Brathwaite. It argues that the evidence and the facts found by the trial court clearly indicate that Feher's actions were premeditated and intentional, both before and after shooting Brathwaite and that the findings regarding the shooting compel a conclusion that Feher's actions were intentional. Brathwaite argues that there is evidence to support the trial court's findings and its conclusions.

■ The issue before us is not whether Feher did or did not intend to shoot Brathwaite, but whether the trial court could have found that he did not, as it did. There is evidence in the record to support the trial court's findings of fact. Therefore, we are bound by those findings. The findings that the evidence does not reveal any viciousness on the part of Feher, that Feher's shooting near O'Shea is as consistent with an intent to frighten him as with an intent to shoot him and that there was no motive or intent to shoot Brathwaite all support the trial court's ultimate factual conclusion that Feher's shooting him was *not* intentional. Because Feher's acts were not intentional, they did not come within the intentional acts exclusion of the policies. Moreover, there is medical evidence that Feher was not able to control his conduct at the time he shot Brathwaite, *i.e.,* that his conduct was not volitional. That evidence also supports the trial court's finding that Feher did not act intentionally. *See Safeco Ins. v. House,* 80 Or App 89, 96-97, 721 P2d 862, *rev den* 302 Or 86 (1986).

Aetna argues that, under Washington law, there are some actions which are presumed intentional as a matter of law. In *Rodriquez v. Williams, supra,* the court held that an insured intends harm, as a matter of law, when he commits incest. The Washington Supreme Court concluded that it is not proper to apply a "reasonable man" standard in determining what consequences should be expected from an insured's actions. Rather, a standard that includes the subjective intent of the insured is appropriate.[5] The court stated that, by making incest a felony, the legislature had determined that incest would always cause harm. Therefore, it held that, as a matter of law, an insured intends harm when he commits incest. 107 Wash 2d at 387.

We find no Washington case law which mandates a holding that, when a person intentionally shoots a rifle, he necessarily intends to kill a person who also is in that area. Feher's subjective intent in shooting the rifle was an issue. *See Rodriquez v. Williams, supra,* 107 Wash 2d at 386. The burden of proof was on Aetna to show that Feher intended to shoot Brathwaite. The trial court found that Aetna had failed to sustain its burden of proof on the issue of Feher's subjective intent. We may not disturb supported findings of fact on appeal. The trial court's findings support its legal conclusion. Therefore, Aetna must defend and indemnify the Feher estate.

Affirmed.

---

[5] "While doubtlessly the average purchaser of insurance would believe that incest would harm a child, the policy specifically states that the insured must expect or intend harm. Thus, the policy language itself is inconsistent with a blanket objective person standard, and the policy language must control. Moreover, if an objective standard is used, virtually no intentional act would ever be covered. Intentional acts which result in injury generally can be expected to result in injury. An objective standard, especially provided after the fact, would seem to render meaningless the plain language providing for coverage for certain intentional acts." 107 Wash 2d at 386.